# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-20-00314-CV
NO. 03-20-00315-CV

**D. L. G., Sr. and C. K. M., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
### NOS. C-17-0004-CPS & C-17-0092-CPS
### THE HONORABLE GARY L. BANKS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In two appeals consolidated for consideration, D.L.G., Sr. (Father) and C.K.M. (Mother) each appeal the trial court's final orders terminating their parental rights to their three children. Cause number C-17-0004-CPS involved Mother's and Father's parental rights to "Kendra" and "Danny," ages eight and three when trial began, and cause number C-17-0092-CPS involved Mother's and Father's rights to their son "Alex," age one when trial began.[1] We will affirm the orders of termination.

---

[1] We refer to the children with pseudonyms. *See* Tex. R. App. P. 9.8.

BACKGROUND

*Cause Number C-17-0004-CPS (concerning Kendra and Danny)*

Father and Mother most recently became involved with the Department in April 2016[2] after it received reports of Father's physical and emotional abuse of Kendra and Danny, his domestic violence towards Mother, unsanitary conditions of the home, the parties' impending eviction from their home, and Mother's and Father's illegal drug use. The Department assigned the parties to Family Based Safety Services (FBSS) to address its concerns but in January 2017 filed an Original Petition for Protection of Children, for Conservatorship, and for Termination. At the time, Kendra and Danny were living with Mother, and Father's address was unknown. The Department removed the children shortly thereafter pursuant to an emergency court order; the order also appointed a guardian ad litem and attorney ad litem for the children.

In May 2018, the Department filed a Motion for Monitored Return of the children, which the trial court granted, allowing the two children to return to Mother's care on a monitored-return basis. In August, the trial court rendered a Permanency Hearing Order finding that Mother "has demonstrated adequate and appropriate compliance with the service plan" but that Father "has demonstrated minimal compliance" and ordering that the service plans "shall continue without modification." In September, the Department removed Kendra and Danny from the monitored placement and filed a Motion to Revoke the monitored return. The trial court denied the motion in an order requiring the Department to return the children to Mother under monitored return. The order also prohibited Father from having contact, and Mother from permitting him to have contact, with the children except with Department approval.

---

[2] Mother testified that the Department had been involved with the family since 2011, when Kendra was eight months old, with previous investigations occurring in 2011, 2013, and 2015.

A bench trial occurred in November 2018, after which the trial court rendered in open court (and signed two months later, on January 19, 2019) a final order (Prior Final Order) in accordance with an agreement between the parties. The Prior Final Order appointed Mother as permanent managing conservator, removed the Department as managing and possessory conservator, and appointed Father as possessory conservator with limited rights to supervised possession of and access to Kendra and Danny while Alex's cause was pending and, upon the dismissal of Alex's cause, standard possession rights absent an alternate agreement with Mother.

In February 2019, the Department filed a Motion to Modify for Protection of a Child, for Conservatorship, and for Termination in Kendra and Danny's case, again seeking the emergency removal of the children and alleging that Mother's home was unsafe and unsanitary (e.g., having piles of dog feces on the floor, no food in the fridge or freezer, and unstable furniture on which the children were climbing); that Mother was permitting Father to visit Alex at her home (despite his having the right to only supervised visits with Alex at Department offices); and that Mother was allowing other individuals who use drugs to visit her and the children at home despite her service plan prohibiting such contact. The court ordered an emergency removal and rendered temporary orders requiring Father and Mother to comply with their respective service plans. Mother's service plan required that she attend counseling; maintain stable employment and a clean, safe, drug-free living environment; establish a support system; complete a substance-abuse assessment, submit to drug tests as required by the Department, and test negative for illegal drugs; and attend weekly visitation with her children. Father's service plan required him to maintain stable employment and a clean, safe, drug-free living environment; establish a support system; complete a substance-abuse assessment; submit to drug tests as required by the Department; test negative for illegal drugs; attend parenting

3

classes; attend weekly visitation with his children; and complete a Battering Intervention and Prevention Program (BIPP).

Kendra and Danny had been in various foster-care placements during the pendency of this cause, and shortly before trial began in June 2019 they were placed with the same foster family with whom Alex was living.

*Cause Number C-17-0092-CPS (concerning Alex)*

While the cause concerning Kendra and Danny pended, Alex was born in August 2017, and the Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination as to Alex within days of his birth because he tested positive for marihuana at the hospital. The trial court ordered emergency removal of Alex and later rendered temporary orders requiring Father and Mother to comply with various services and appointing the same guardian ad litem and attorney ad litem for Alex as for the older two children.

In January 2019, the trial court rendered an order for the monitored return of Alex to Mother. The order granted Father weekly visitation, supervised at the Department's offices, and additional visitation to be supervised by Mother but contingent on Father submitting to drug tests as requested by the Department and testing negative for alcohol and illegal drugs. The following month, on the same date that the trial court ordered the emergency removal of Kendra and Danny from their monitored return, the Department filed a motion to remove Alex from the monitored return, which the trial court granted. Alex was returned to the same foster family with whom he had lived since he was removed from the hospital and remained there through trial.

4

*Trial*

Both causes were tried to the court together over several months, commencing in June 2019 and concluding on November 26, 2019. Several witnesses testified, including: Jenna Hooks, Department investigator; Kathryn Gassiot, Department conservatorship worker; Julie Campbell, Department caseworker; Stephanie Patino, Department visitation supervisor; Kimberly Cardona, the manager of the apartment building where Mother lived when the children were most recently removed; Father; Mother; and the children's foster mother. The trial court admitted several exhibits, including family service plans and photographs of Mother's prior apartment and of the couple's home at the time of trial.

Hooks testified about the reasons for Kendra's and Danny's removal from their monitored return with Mother: the apartment's filthy and unsanitary condition, the absence of food in the home, and Mother's allowing unauthorized individuals into the home. Gassiot testified that when she visited Mother's apartment unannounced in November 2018, it was "very dirty" with dog feces and stains "all over the floor," a large adult-sized hole in the wall, "dirty dishes everywhere," no food in the home, and dirty bedding on the children's beds. Gassiot explained that she informed Mother that she needed to clean up the home by 4 p.m. that day. Gassiot provided Mother with cleaning supplies in November and offered to take her to get food for the family, but Mother did not accept the help. Gassiot made another unannounced visit in January 2019 and observed the apartment to be "a bit worse than the prior" time. She said that again there was dog feces on the floor, she observed a dog urinating on the floor, and Alex's crib sheets and Danny's bedding were "extremely filthy." The trial court admitted photographs of Mother's apartment from Gassiot's two visits, depicting the conditions she described, including

multiple piles of dog feces on the floor throughout the apartment and heavy stains on the children's beds.

Various witnesses testified about Mother's and Father's illegal drug use while the causes pended. Gassiot testified that Father and Mother tested positive for marihuana in January and February 2019, respectively. Campbell testified that Father did not submit to the Department's requested tests between March and June 2019 and that Mother did not submit to tests in June and July 2019.[3] Father admitted on the stand to refusing to take a drug test as recently as November 18, 2019, even though trial was ongoing, and Campbell testified that Mother tested positive for marihuana in November 2019, at significantly higher levels than she had tested in February.

Witnesses testified about Father's failure to exercise his visitation rights with the children while the causes were pending. Patino testified that from mid-April through August 2019, Father did not attend any visits. Mother explained Father's absence as being due to his working out of town, and Father did interact with the children at a couple of the visits remotely via "Facetime" on Mother's phone. Gassiot testified that, during her time as caseworker in the months leading up to and including trial, Father did not regularly attend visitation, keep in contact with her, or take parenting classes.

Multiple witnesses testified about Mother's and Father's failures to comply with their court-ordered family service plans. Gassiot testified that Father's required substance-abuse assessment recommended that he undergo treatment, but that he did not complete the treatment because he "got angry and upset." She further testified that, as of trial, Father had not completed

---

[3] Mother's and Father's service plans indicated that a failure to submit to a requested test would be considered a "positive" test.

6

his substance-abuse treatment and had not started the required BIPP, despite his admitting on the stand to having "one or two" family-violence convictions. Mother's family service plan effective during the children's monitored return prohibited her from allowing Father to have any access to or visits with the children without Department approval and to notify the Department of any adult visitors or new home members so that it could run background checks on them. The foster mother testified that during the most recent monitored return, she had observed Father and another male "picking up sheets and things, like they had slept on the living room" of Mother's apartment, even though Alex was with Mother at the time and Father was expressly prohibited from having contact with Alex except at Department offices. Cardona testified about Mother having adults who visited and stayed overnight at her apartment for periods of time, including her sister and a male cousin; Gassiot testified that these individuals were not authorized adult visitors at Mother's apartment. Gassiot testified that Mother stopped taking Kendra to counseling appointments as required by her service plan, and Campbell and Gassiot testified that Mother did not provide proof that she had participated in individual counseling or a mental-health assessment as required.

After trial concluded, the trial court took the causes under advisement and later rendered final termination decrees in each, finding that termination of Mother's and Father's parental rights was in the children's best interest and that Father and Mother had each committed at least one statutory predicate act under the Family Code. *See* Tex. Fam. Code § 161.001. This appeal ensued.

**DISCUSSION**

Both Mother and Father challenge the legal and factual sufficiency of the evidence supporting the trial court's findings that termination of their parental rights was in the children's best interest, *see id.* § 161.001(b)(2), and Father challenges the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings under subsections (D) and (E), *see id.* § 161.001(b)(1)(D), (E). Father additionally contends that the trial court erred in admitting evidence of events that occurred before the Prior Final Order was rendered because the Department did not plead for termination of his parental rights under section 161.004 but only under section 161.001. *See id.* § 161.004 (providing for termination of parent-child relationship after rendition of prior order denying termination if parent committed section 161.001 predicate act before prior order was rendered, circumstances have materially and substantially changed, and termination is in child's best interests); *In re K.P.*, 498 S.W.3d 157, 170 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("When the Department does not plead section 161.004 as grounds for termination, it is error to admit evidence from before a prior decree denying termination.").

As to Father's latter complaint, we conclude that he failed to preserve the issue for our review by not objecting to the trial court's admission of evidence from before the Prior Final Order. *See Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007) ("Error is waived if the complaining party allows the evidence to be introduced without objection."); *see also* Tex. R. App. P. 33.1(a) (detailing requirements to preserve appellate complaints); Tex. R. Evid. 103(a)(1) (detailing requirements to preserve error on evidentiary rulings). However, even if Father had preserved the issue, we would conclude that the evidence

8

of events and circumstances since the Prior Final Order was sufficient to terminate his parental rights, as discussed below.

*Standard of review*

In an appeal from the termination of parental rights, legal- and factual-sufficiency challenges require a heightened standard of review. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In reviewing the legal sufficiency, we view all the evidence in the light most favorable to the finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.L.*, 163 S.W.3d 79, 84–85 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 265–66. We do not, however, disregard undisputed evidence that does not support the finding. *J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

*Father's challenge to the trial court's endangerment findings*

The trial court found that Father knowingly placed or allowed the children to remain in conditions that endangered their physical or emotional well-being and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). Both subsections (D) and (E) require proof of child endangerment, that is, "exposing a child to loss or

9

injury or jeopardizing a child's emotional or physical well-being." *A.C. v. Texas Dep't of Family & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (citing *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

"Endangerment does not need to be established as an independent proposition but may be inferred from parental misconduct." *Id.* Although "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Boyd*, 727 S.W.2d at 533). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the result of the parent's conduct, including acts and omissions or failures to act. *A.C.*, 577 S.W.3d at 699. "Termination under this subsection must be based on more than a single act or omission; instead, 'what is required is a voluntary, deliberate, and conscious course of conduct.'" *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

A factfinder may infer that a parent's lack of contact with a child and absence from the child's life endangers the child's emotional well-being, *id.* at 765, and a parent's inconsistent participation in visitation can emotionally endanger a child's well-being, supporting termination under subsection (E), *In re D.A.*, No. 02-15-00213-CV, 2015 WL 10097200, at *5 (Tex. App.—Fort Worth Dec. 10, 2015, no pet.) (mem. op.) ("[T]he risk of emotional harm from a parent's missed visits with a child may support a finding of endangerment."); *In re S.I.H.*, No. 02-11-00489-CV, 2012 WL 858643, at *5 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem. op.).

A parent's illegal drug use may also constitute endangerment under subsection (E). *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *In re M.C.*, 482 S.W.3d 675, 685 (Tex. App.—Texarkana 2016, pet. denied) ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under [subsection (E)]." (internal quotation marks omitted)); *T.M. v. Texas Dep't of Family & Protective Servs.*, No. 03–14–00784–CV, 2015 WL 3393943, at *2 (Tex. App.—Austin May 21, 2015, no pet.) (mem. op.) ("It is well-established that a parent's illegal drug use may constitute endangerment.").

"Conduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *Jordan*, 325 S.W.3d at 723. A parent's missed visitations, violence, drug use, and failure to complete a court-ordered service plan may support an endangerment finding because such conduct subjects children to instability and uncertainty and therefore endangers them. *See In re A.R.M.*, 593 S.W.3d 358, 371 (Tex. App. —Dallas 2018, pet. denied).

Here, the Department presented evidence that since the Prior Final Order was rendered, Father missed visitations with the children for several consecutive months and otherwise attended irregularly; failed to take most of his required drug tests; tested positive for illegal drugs or essentially admitted to using illegal drugs;[4] failed to complete court-ordered services including BIPP, substance-abuse treatment as recommended per his assessment, and

---

[4] In answer to the Department's question at trial about whether he had "tested positive" on some of the Department's drug tests, Father responded, "I can't answer that correctly without that making me look bad."

parenting classes; failed to provide proof of stable employment; and failed to establish a safety support network beyond Mother. Patino testified that at two of the visitations Father did attend, he engaged in angry outbursts that frightened the children and caused them to cry. This behavior, in conjunction with his failure to complete BIPP, demonstrates that his anger-management issues remained unaddressed. When Gassiot visited Father and Mother at the home in which they were living at the time of trial, Father and Mother shouted at her. Father testified how he explained to a Department caseworker why he could not attend one of his scheduled visitations: "I've been drinking and I don't feel I need to go see my kids at that time." Father further testified that, while the children were on monitored return with Mother, he visited them at Mother's apartment about twice a month; however, there was no evidence that Father reported to the Department the apartment's unsanitary conditions or attempted to remedy them. He also testified that he believed if Mother were to test positive for illegal drugs, she could still "take care of our kids."

Father presented testimony contradicting some of the evidence summarized above. For example, he testified that he had been working at Dairy Queen for the past few months and with the handyman business Rent-a-Husband before that. He also testified that he and Mother were living in an appropriate, clean home they had purchased under a contract for deed and that he had been fixing up the home in anticipation of the children's return. However, "evidence of a recent turn-around in behavior by the parent does not totally offset evidence of a pattern of instability and harmful behavior in the past." *N.P. v. Texas Dep't of Family & Protective Servs.*, No. 03-19-00217-CV, 2019 WL 3952842, at *8 (Tex. App.—Austin Aug. 22, 2019, no pet.) (mem. op.). Further, the trial court, as factfinder, was the sole judge of

12

the credibility of the witnesses and the weight to be given their testimony. *See In re P.A.C.*, 498 S.W.3d 210, 214 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Considering all of the evidence in the light most favorable to the trial court's finding, we determine that the trial court could have reasonably formed a firm belief or conviction that Father endangered the children by posing emotional risks to them and by generating instability and uncertainty in their lives, especially considering his months-long failure to attend visitations, failure to adequately address his violence and anger issues, and continuing illegal drug use. We therefore conclude that legally sufficient evidence supports the trial court's finding under subsection (E). In addition, viewing all of the evidence in a neutral light, we determine that the trial court could have reasonably formed a firm belief or conviction that Father endangered the children. Therefore, we conclude that factually sufficient evidence supports the trial court's finding under subsection (E). Having found the evidence legally and factually sufficient to support the predicate ground set out in subsection (E), we overrule Father's issue and do not address the sufficiency of the evidence to support the trial court's predicate-ground finding under subsection (D). *See In re N.G.*, 577 S.W.3d 230, 232–33, 237 n.1 (Tex. 2019) (per curiam); *K.N.K. v. Texas Dep't of Family & Protective Servs.*, No. 03-19-00901-CV, 2020 WL 3239944, at *7 (Tex. App.—Austin May 21, 2020, no pet.) (mem. op.).

*Mother's and Father's challenges to the trial court's best-interest findings*

The best-interest prong of the termination statute "is child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). When deciding the best-interest issue, we consider the well-established *Holley v. Adams* factors, which include the child's wishes, the child's emotional and physical needs now and in

the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. *See* 544 S.W.2d 367, 371–72 (Tex. 1976); *see also A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at 27. The Department need not prove all the *Holley* factors as a "condition precedent" to termination, and the absence of evidence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination of parental rights is in a child's best interest. *C.H.*, 89 S.W.3d at 27; *Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).

*The children's wishes*

Campbell and Patino testified that Kendra expressed a desire to return to Mother but did not express the same desire as to Father. Gassiot testified that Kendra told her she "just wants to be safe" and that Kendra needed a stable home free of drugs and domestic violence and needed assistance with her academics. While Alex and Danny were too young to express their desires, evidence showed that they were doing "phenomenal" in their foster home, where they felt loved and received "lots of hugs." The foster mother testified about the bond she has with the children, her and her husband's desire to adopt them, and the children's feelings of safety in her home.

When a child is too young to express his or her desires, the court may consider the quality and extent of his or her relationships with prospective placements, *see L.Z. v. Texas Dep't of Family & Protective Servs.*, No. 03-12-00113-CV, 2012 WL 3629435, at *9 (Tex.

14

App.—Austin Aug. 23, 2102, no pet.) (mem. op.), and evidence that a child is well cared for and is bonded with the foster family and has spent minimal time in the presence of his or her parents, *In re D.A.B.*, No. 04-19-00629-CV, 2020 WL 1036433, at *7 (Tex. App.—San Antonio Mar. 4, 2020, no pet.) (mem. op.). Campbell testified that the children appear happy, adjusted, and as though they feel safe in the foster home. Despite Kendra's expressed desire to return to Mother, the trial court could reasonably have weighed this factor in favor of termination, given the evidence of Father's and Mother's endangering conduct and the children's needs to live in a safe, stable, and appropriate environment.

### *The children's current and future needs and emotional and physical danger now and in the future*

The factfinder may infer that a parent's past unsuitable conduct will continue into the future, *In re E.A.*, No. 13-06-503-CV, 2007 WL 2471459, at *8 (Tex. App.—Corpus Christi Aug. 31, 2007, no pet.) (mem. op.), and a parent's inability to provide adequate care for her children, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest, *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). Evidence showed that both Mother and Father continued to use illegal drugs during the pendency of the case, and Mother's use of drugs while pregnant with Alex is what began the Department's involvement with him. A parent's continued drug use demonstrates "an inability to provide for [the child's] emotional and physical needs" and "demonstrates an inability to provide a stable environment for" the child. *In re F.A.R.*, No. 11-04-00014-CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.). A factfinder can give "great weight" to the "significant factor" of drug-related conduct. *Dupree v. Texas Dep't of Protective & Reg. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). Furthermore, a parent's

15

inability to provide a stable home, remain gainfully employed, or comply with a court-ordered service plan supports a finding that termination is in the child's best interest. *In re D.C.*, 128 S.W.3d 707, 717 (Tex. App.—Fort Worth 2004, no pet.).

The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). Kendra and Danny have been in and out of foster homes for much of their young lives, and Alex has lived with the same foster family for nearly his entire life. Their foster parents hoped to adopt them. A factfinder may consider that the best interest of a child may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination did not occur. *See C.C.F. v. Texas Dep't of Family & Protective Servs.*, No. 03-20-00152-CV, 2020 WL 4929782, at *6 (Tex. App.—Austin Aug. 19, 2020, pet. denied) (mem. op.).

The evidence showed that the children were removed from their monitored return due to the squalid conditions of Mother's apartment and that both Father and Mother tested positive for marihuana while the children had been living in such conditions; neither parent completed their court-ordered services, which were designed to ameliorate the issues that led to the Department's involvement; neither parent provided proof of stable employment history; both parents failed to drug-test on multiple occasions since February 2019; Father engaged in aggressive behavior in front of the children on two occasions; both parents engaged in aggressive behavior towards a caseworker; Mother tested positive for marihuana during trial at higher levels than she had tested at the children's removal in February 2019; and Mother allowed unauthorized individuals to be in her apartment during the monitored return despite being advised that such behavior was contrary to her service plan. Mother has not challenged the

16

trial court's endangerment findings on appeal, and the trial court was free to weigh evidence of both parents' endangering conduct in considering these factors. While Mother testified that she had, in fact, completed her court-ordered services, and both she and Father testified about their current home as being safe and stable, the trial court was free to disbelieve such testimony. *See L.D.-C. v. Texas Dep't of Family & Protective Servs.*, Nos. 03-18-00115-CV, 2018 WL 2976339, at *3 (Tex. App.—Austin June 14, 2018, no pet.) (mem. op.). We conclude that the evidence as to these factors weighs heavily in favor of termination.

*The parenting abilities of and programs available to help the parties seeking custody*

In considering these factors, the trial court could have considered the evidence recited directly above to conclude that Mother's and Father's parenting abilities were minimal and that Mother and Father had eschewed the opportunity to engage in important services available to them such as parenting classes, drug testing and treatment, counseling, and BIPP, despite knowing that their parental rights were in jeopardy. *See Wilson v. State*, 116 S.W.3d 923, 925 (Tex. App.—Dallas 2003, no pet.) (noting that parent's poor parenting skills and lack of motivation to "learn how to improve those skills" supports finding that termination is in child's best interest); *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.) (noting that factfinder can infer from parent's failure to avail herself of programs offered by Department that parent "did not have the ability to motivate herself to seek out available resources needed . . . now or in the future"). This factor weighs in favor of termination.

17

*The plans for the children of the parties seeking custody and the stability of the proposed placements*

At the time of trial, Mother and Father were living in a house that Gassiot testified smelled of animal feces or urine, and a kitten and a dog were present in the home, despite the issues that arose from Mother's keeping of pets in her apartment while the children were on monitored return.[5]  While trial was ongoing, Mother tested positive for illegal drugs, Father failed to submit to drug testing, and neither had completed their court-ordered services.  While Father testified about the repairs and renovations he had been making to the home and submitted photographs of the home's condition in an attempt to demonstrate its appropriateness for children, the trial court was free to weigh this evidence against the evidence of the parents' ongoing drug use and failure to complete services as well as consider the stability of the foster home and significant evidence of how the children were thriving there and having their emotional and physical needs met.  This factor weighs in favor of termination or is, at best, neutral.

*The parent's conduct indicating the parent-child relationship is improper and any excuses therefor*

In light of Mother's and Father's ongoing drug use and failure to complete their court-ordered services, Mother's use of illegal drugs while pregnant and her failure to provide an appropriate home environment for the children, and Father's failure to maintain regular contact with the children for several months combined with his aggressive behavior in front of the children, the trial court could have concluded that Father's and Mother's relationship with their

---

[5] In addition to the multiple piles of dog feces on the floor and Mother's apparent inability or unwillingness to properly care for her pets, evidence showed that Mother was consistently behind on making rent payments and paying required pet deposits, which were significant factors in her being evicted after the Department removed the children from her care.

18

children was not proper. While both Father and Mother testified about the bonds they had with their children and their love for them, the trial court was free to weigh that evidence against the overwhelming evidence of endangerment and the parents' failures to complete their services. Mother and Father did not provide any excuses for their acts or omissions under this factor. This factor weighs in favor of termination.

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of Father's and Mother's parental rights was in the children's best interest. After considering the disputed evidence, we conclude that a reasonable factfinder could have resolved that evidence in favor of the finding and that it is not so significant that a reasonable factfinder could not have formed a firm conviction or belief that termination of Mother's and Father's parental rights is in the children's best interest. After consideration of the *Holley* factors and the evidence presented to the court, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that the best interest of the children will be served by terminating Mother's and Father's parental rights.

**CONCLUSION**

We overrule Mother's issue challenging the trial court's finding that termination of her parental rights is in Kendra's, Danny's, and Alex's best interest. We also overrule Father's issues challenging the court's finding that he engaged in conduct that endangered Kendra's, Danny's, and Alex's physical or emotional well-being and that termination of his parental rights is in the children's best interest. Consequently, we affirm the trial court's orders of termination in both cause numbers.

19

_____

Thomas J. Baker, Justice

Before Chief Justice Rose, Justices Baker and Kelly

Affirmed

Filed:   November 19, 2020